***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury, which is the subject of this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all times relevant to this claim, the employer-employee relationship existed between plaintiff and defendant-employer.
3. American Protection Insurance Company is the carrier on the risk.
4. Plaintiff's average weekly wage may be determined by an accurate wage chart, Form 22, prepared by defendants.
In addition, the parties stipulated into evidence the following: Industrial Commission Forms 18, 33, 19, 33R, and a packet of medical records, business records and a recorded statement.
 ***********
Based on the foregoing stipulations and the evidence the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of hearing before the deputy commissioner, plaintiff was twenty-three years old, a high school graduate and a college student. In September 2001, plaintiff began working for defendant-employer, a pharmaceutical distribution facility. She is right-handed and initially worked as a "picker" of over-the-counter products, a job that involved gathering items listed on order sheets and placing them into "totes," which she pushed on a large metal cart through the warehouse. The items listed on the order sheets included products such as shampoo and mouthwash. Plaintiff usually only had to lift a single bottle or item at one time in order to place it into the tote. However, she had to work quickly because there were several other employees doing the same thing and waiting to get to the same spot. Therefore, plaintiff would "park" her cart to one side and walk to the shelves to pull products. Plaintiff testified that "[s]ometimes the order may call for ten of the big bottles of Listerine, and you have to pull all ten and try to carry as many as possible, as fast as possible." Plaintiff, who is 5'2", testified that the cart, which is approximately five to six feet tall, is taller than she is. The cart carried sixteen to eighteen hard plastic totes, or containers, which were similar to Tupperware containers. Plaintiff testified that an empty totes weighed from five to eight pounds. The cart had four shelves and six wheels. Plaintiff was required to push the cart around the warehouse "everywhere" she went.
2. In the summer of 2002, plaintiff moved to the Quality Control ("QC") section in the Over the Counter products area ("OTC"), where she scanned items in totes already filled by pickers to make sure that all of the ordered items were there. If ordered items were missing from the tote, plaintiff placed that tote on the floor and another employee would take the tote back into the warehouse to find the missing items. If the totes were correctly filled, plaintiff scanned the items through a machine similar to a grocery store scanner and lifted the tote onto a conveyor belt. A full tote weighs approximately 45 pounds. Plaintiff's job duties required her to stand at all times during her eight-hour shift. Plaintiff had one 30-minute lunch break and two 15-minute breaks.
3. The job description for OTC picker in the QC section stated that an employee must be able to lift from 5 to 45 pounds, stand for 7 hours, walk for 1 hour, and sit for 2 hours. However, plaintiff testified that there was no sitting unless she was on break. The job description also noted that an employee had to lift 350 to 500 times per day. Plaintiff further testified that she continuously grasped and lifted items and moved them from shelves onto her cart.
4. In October 2002, plaintiff sustained an injury by accident to her right shoulder at work when she reached for a heavy item on the top shelf and experienced numbness from her shoulder to her elbow. Plaintiff sought treatment with Dr. Spillman, who diagnosed right trapezius and right super spinous sprain. Dr. Spillman gave plaintiff light-duty restrictions and recommended that she remain out of work until on or about Thanksgiving Day in 2002. However, when plaintiff returned to work, defendant-employer placed plaintiff in a position that exceeded her restrictions. Subsequently, plaintiff was assigned to warehouse duty where she did inventory checks. This previous injury is not an issue in the instant claim.
5. As of January 2003, plaintiff was working as a runner on the prescription ("RX") level of the facility, which involved locating items found to be missing by a quality control employee. The totes in RX were approximately shoebox size, and plaintiff put bottles of prescription medication in them. As she had done in OTC, plaintiff pushed the totes on a cart down the aisles on the RX floor. If missing items were on the warehouse shelves, she would put them into the correct tote. If the warehouse was out of the item, she would follow a different procedure.
6. On Friday, 24 January 2003, plaintiff bent down to locate a tote on the bottom of her cart. As she lifted the tote, she felt a sharp pain from her left hip to her left toes. The pain, although intense, was brief and came and left very quickly. After the pain went away, plaintiff continued performing her job duties until her shift was over. Later after plaintiff had gone to bed, the same pain radiating throughout her left leg awakened her. Plaintiff testified that the pain was unbearable but only lasted for "a couple of seconds." Plaintiff also testified that she continued to work so that she could pay her rent and bills. Plaintiff supported herself and paid for her own tuition.
7. On Sunday, 26 January 2003, plaintiff told Tammy Bates, the quality control lead person in the RX section, about the pain in her left leg. Ms. Bates gave plaintiff pain medication. Plaintiff testified that she did not know at that time what had caused her pain, so she did not fill out an incident report. On Wednesday, 29 January 2003, plaintiff's pain occurrences had significantly increased, but she still did not take time off from work so that she would not be penalized, as defendant-employer had a no-fault attendance policy. Plaintiff's supervisors, Anthony Riley and Ronnie Arnold knew that plaintiff was in pain because she told them. Mr. Riley indicated that when plaintiff's pain became very bad, she could sit in the break room. However, once plaintiff went into the break room, Mr. Arnold told plaintiff that she was needed out on the floor. Other employees also knew that plaintiff was in pain because they saw her crying while she was at work on 29 January 2003.
8. After she finished her shift on 29 January 2003, plaintiff went to Moses Cone Hospital in Greensboro, North Carolina. Plaintiff testified that she told the hospital staff about the incident at work the previous Friday, but the emergency room staff did not seem to be paying much attention to her. The medical staff prescribed Vicodin. The emergency room record provided that plaintiff's chief complaint was severe pain in her left hip that had begun five days ago with no known injury.
9. Plaintiff followed up with her family physician, Dr. William M. McGough on 1 February 2003. Plaintiff reported pain in her left hip radiating to her left toes for a duration of one week and described intermittent pain on the left side of her back radiating to her foot. Dr. McGough testified that he had no recollection or notions of whether plaintiff told him how her pain began, although he noted on 6 February 2003 that plaintiff said that her left side was sore due to an injury at work. Plaintiff did not have a prior medical history of low back pain. Dr. McGough ordered a lumbar MRI to rule out a herniated disc. The MRI revealed a large herniated disc at L4-5, which was displacing the thecal sac, as well as a smaller protruding disc at L5-S1 which was impinging on the nerve root at that level. Plaintiff also had indications of degenerative disc disease, an unusual finding for someone of plaintiff's young age. Dr. McGough kept plaintiff out of work from 10 February 2003 through 16 February 2003. Based on the findings, Dr. McGough referred plaintiff to Dr. Ernesto Botero, a neurologist.
10. On 6 February 2003, plaintiff notified her employer that she had been injured at work. Even though she was suffering from the effects of her pain medication, she filled out a statement at the insistence of Deborah Woods, the human resources manager. In the statement, plaintiff indicated that her hip and leg had started hurting on 24 January 2003, that she had no idea at the time why she was having the pain but that she had been lifting totes with her left arm because they were heavier than she was supposed to lift with her right arm and that the totes were at times very heavy. Plaintiff testified that she made a mistake by dating the statement 6 January 2003; the correct date was 6 February 2003. At the time she wrote her statement, no one told plaintiff that she needed to fill out any other forms.
11. Defendants filed a Form 19 report of an employee's injury on 7 February 2003. Subsequently, they also filed a Form 33R response to plaintiff's request for hearing and attached a statement that defendants have denied the claim on the grounds that she did not suffer an injury by accident. Defendants indicated that they were continuing to investigate plaintiff's claim.
12. On 11 February 2003, plaintiff gave a recorded statement to Lynn LeGrone, who worked for defendant-carrier. In the recorded statement, plaintiff stated that she was 5'2", weighed approximately 155 pounds and was a college student. Plaintiff also described her job duties. Plaintiff further stated that she was injured on 24 January 2003 but did not realize that she could have been injured at work until her doctor suggested it to her after looking at the MRI results in February 2003. Plaintiff described the brief, but intense, pain that she experienced on 24 January 2003 when she pulled a tote from the bottom of her cart and stated that the pain grew in intensity and radiated from her left hip to her left toes. Plaintiff stated that the tote weighed in excess of 10 pounds and was probably 15 to 20 pounds. She stated that she informed management of her pain on 26 January 2003 and went to the hospital on 29 January 2003. Plaintiff further stated that she believed her injury was work-related because she does not lift anything more than 10 pounds outside of her job. She does not even clean her home or carry a bookbag at school. Plaintiff noted that she lifts with her left side since she is not supposed to lift with her right side due to her previous right shoulder injury. Plaintiff confirmed that other than the injury to her right shoulder, she has never been injured before or been in an accident.
13. On 12 February 2003, Ms. LeGrone issued a letter to plaintiff stating that defendant-carrier's investigation "indicat[ed] that the disabling event for which [she] sought treatment did not occur at work."
14. Dr. Ernesto Botero first treated plaintiff on 13 February 2003. Plaintiff reported that she had sustained a work-related injury in January 2003 and experienced pain from her left hip to her left foot. Plaintiff was limping slightly at this appointment. An MRI and x-ray showed a large herniated disc at L4-5. Dr. Botero opined that the pinched nerves at L4-5 and L5-S1 caused plaintiff's symptoms and kept her out of work. A medical note dated 13 February 2003 stated that plaintiff would be out of work until further notice. Plaintiff underwent two epidural injections in March 2003, which were done by a radiologist. Because of her young age (23 at the time), Dr. Botero did not want to operate, so he recommended physical therapy and medication, along with the injections. Dr. Botero opined that in a person as young as plaintiff, most disc herniations result from a traumatic occurrence.
15. On 4 March 2003, plaintiff filed a Form 18 notice of accident in which she stated that she injured her back on 24 January 2003 when she lifted a tote with her left side after defendant-employer did not provide her with work within her restrictions. Plaintiff also filed a Form 33 request for hearing on 4 March 2003.
16. On 17 March 2003, Dr. Botero's note described plaintiff as "not any better." Plaintiff continued to complain of left leg pain and weakness. On that date, Dr. Botero authored a letter to whom it may concern advising plaintiff not to undergo a functional capacity examination for her left shoulder.
17. On 1 April 2003, plaintiff complained of difficulty sitting for long periods of time. She did not want to undergo surgery while she was in school; therefore, surgery was not performed until 6 May 2003. Dr. Botero did a total gross diskectomy by removing the damaged disc at L4-5 and enlarging the nerve canal at L5-S1 on the left side. Plaintiff remained hospitalized until 10 May 2003.
18. On 5 June 2003, plaintiff complained of numbness around nerve 5 (top of left foot), but Dr. Botero opined that this was normal after surgery. Plaintiff was prescribed Demerol and advised to lose weight, walk and engage in water aerobics. Dr. Botero testified that plaintiff needed to lose approximately 70 pounds because she was 5'2" and 180 pounds. Plaintiff complained of back pain on 17 July 2003, but no leg pain. On 30 October 2003, plaintiff reported left leg pain. An MRI was ordered. It revealed no significant changes. As of the date of his deposition (3 November 2003), Dr. Botero had not released plaintiff from his treatment.
19. Dr. McGough opined that the incident on 24 January 2003 caused, aggravated or exacerbated plaintiff's disc herniation. He also opined that his treatment was necessary and reasonable to relieve plaintiff's condition.
20. Linda Parrish worked with plaintiff at defendant-employer in quality control. She testified that she was fired after she injured her shoulder and missed too many days due to the injury. She also testified that plaintiff's description of her job duties was accurate. Ms. Parrish observed plaintiff in the cafeteria or break room crying because she was in so much pain. Plaintiff told Ms. Parrish that she had informed management, including Anthony Riley, Tammy Bates, and Ronnie Arnold of her injury.
21. Carmen L. Adams, a registered nurse, is plaintiff's cousin and roommate. She testified that plaintiff complained of pain in her leg at the beginning of 2003. Ms. Adams mentioned to plaintiff that leg pain could be caused by problems in one's back and that sometimes the pain was shooting. Ms. Adams testified that plaintiff favored her right leg, even while sitting, and altered her personal life due to her leg pain.
22. Sherita Valentine is a very close friend of plaintiff's. She testified that once following the end of January 2003, while walking from their parked car to the apartment building, plaintiff had to stop and sit down because she had lost feeling in her left leg.
23. Vivian Lindsey, plaintiff's mother, testified that plaintiff called her crying and stated that her leg was hurting on 24 January 2003. Ms. Lindsey called plaintiff's supervisor, Anthony Riley about plaintiff working outside of her restrictions. Mr. Riley assured Ms. Lindsey that plaintiff would only work light-duty and be able to sit down when she needed.
24. Mark Whittaker, a manager at defendant-employer, testified that defendant tried to accommodate plaintiff's restrictions by allowing her to work in different positions. As a quality control worker, plaintiff's totes were smaller than a shoebox. However, he stated that the job description was accurate as to lifting a maximum of 45 pounds.
25. Tia Grant, the operation supervisor at defendant-employer, testified that on 24 January 2003, plaintiff did not report an injury to her. Ms. Grant testified that she never asked plaintiff to work outside of her restrictions.
26. Dr. Botero opined that the medical treatment, including surgery that he provided to plaintiff was reasonably and medically necessary. He further opined that plaintiff's description of the incident at work more likely than not caused her herniated disc. Dr. Botero testified that it was reasonable for plaintiff to not know what caused her sudden leg and hip pain. There was no evidence of a prior disc problem.
27. Plaintiff's testimony on how she injured her back is found to be credible. Plaintiff gave a consistent history to an emergency room nurse and Dr. McGough of pain in her left hip radiating down her left leg beginning on or about 24 January 2003. Plaintiff stated in her recorded statement taken by defendant-carrier on 11 February 2003, that when she started hurting, she was at work and later that night while sleeping in bed an "excruciating pain" woke her up. The pain went from her hip down to the tip of her toes on her left side. Plaintiff further stated in her recorded statement in response to the adjuster's question on whether anything specific caused her pain, "I remember I was like I said, I was looking at the totes so I could find one that I had to pull out, I remember pulling out that one tote, I remember a pain that hit my left side, down my left leg, but like I said, at the time I did not pay that pain any attention because it was not constant after that, it was just one pain that went through." Plaintiff's testimony that she did not know what caused her pain in her hip and leg initially is accepted as credible. Dr. McGough agreed that it would not be unusual for a person not to associate a sharp hip pain that occurred and went away quickly with a lifting incident.
28. On 24 January 2003, plaintiff injured her back while bending down and lifting a tote from the bottom of her cart. As she lifted the tote, she felt a sharp pain from her left hip to her left toes. The pain, although intense, was brief and came and left very quickly. This injury arose out of and in the course of her employment with defendant-employer and constituted a specific traumatic incident as a direct result of the work assigned.
29. Plaintiff's average weekly wage was to be determined by a Form 22 provided by defendants. Defendants did not provide a Form 22 to the Full Commission. Based on the evidence, plaintiff's average weekly wage was $430.00, which yields a compensation rate of $286.68.
30. Plaintiff received long-term disability under a plan wholly funded by defendant-employer.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident or specific traumatic incident by her employer arising out of and in the course of employment as a direct result of the work assigned to her back on or about 24 January 2003 when she bent down and lifted a tote from the bottom of her cart and immediately felt a sharp pain from her left hip to her left toes. N.C. Gen. Stat. § 97-2(6); Richards v. Town of Valdese,92 N.C. App. 222, 224, 374 S.E.2d 116, 118 (1988), disc. rev. denied,324 N.C. 337, 378 S.E.2d 799 (1989).
2. As a result of her injury, plaintiff was temporarily totally disabled from 13 February 2003 to the date of the hearing before the deputy commissioner and ongoing and is entitled to temporary total disability from 13 February 2003 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. Defendants are entitled to receive a credit for long-term disability paid to plaintiff under a plan wholly funded by defendant-employer. N.C. Gen. Stat. § 97-42.
4. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of the compensable injury for so long as such treatment is reasonably required to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25
(2003).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to counsel fees hereinafter approved, defendants shall pay plaintiff temporary total disability benefits in the weekly amount of $286.68 from 13 February 2003 to the date of the hearing before the deputy commissioner and ongoing until further order of the Industrial Commission. Any compensation due plaintiff that has accrued shall be paid to plaintiff in a lump sum.
2. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. A reasonable attorney fee in the amount of 25% of the compensation awarded for plaintiff in paragraph 1 above is approved for plaintiff's counsel. An attorney fee shall be deducted from the accrued compensation due plaintiff and paid directly to plaintiff's attorney prior to the deduction of defendants' credit; thereafter, plaintiff's attorney shall be paid every fourth check from the compensation due plaintiff.
4. Defendants are entitled to a credit for long-term disability compensation paid to plaintiff.
5. Defendants shall pay the costs of this action.
This the ___ day of November 2004
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER